UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

READY CAPITAL CORPORATION,
READYCAP COMMERCIAL, LLC,
and READYCAP HOLDINGS, LLC,

                 Plaintiffs and Counter-defendants,         Case Number 19-13536

v.                                                     Honorable David M. Lawson

READY CAPITAL CORPORATION,
NATIONS HOME LOAN CORPORATION,
MPD, LLC, and MARK BACKONEN,

                 Defendants and Counter-plaintiffs.

_____/

## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The business of both the plaintiffs and the defendants is commercial lending, and they both market their services using the same name: Ready Capital. The plaintiffs registered the mark with the U.S. Patent and Trademark Office (PTO), but the defendants presented evidence of earlier use of the mark in commerce, at least within Michigan. The parties have sued each other for trademark infringement. The defendants raise a laches defense and seek cancellation of the plaintiffs' federal trademark registration, alleging that the plaintiffs made fraudulent statements to obtain it. And both sides have moved for summary judgment on their respective claims and defenses. Aside from the issue of likelihood of confusion, which is obvious, the record presents genuine fact questions that preclude summary judgment in full for either side. However, the defendants have presented sufficient unrebutted evidence to establish their innocent user defense as a matter of law, which limits the temporal and geographic scope of the plaintiffs' federal and common law infringement and false designation claims. The plaintiffs have offered sufficient evidence to rebut the defendants' claim to cancel the mark, demonstrating that the defendants cannot meet their evidentiary burden as a matter of law; and the undisputed evidence in the record defeats the laches

defense.  But the plaintiffs have not established as a matter of law that they are entitled to nationwide priority for the use of the mark before January 2017, and fact questions remain as to the precise boundaries of the defendants' prior use carveout.  The motions for summary judgment will be granted in part and denied in part.

I.

According to the amended complaint, plaintiff Ready Capital Corporation began its corporate life as Sutherland Asset Management in 2011.  It is a private lender that operates nationally, along with several affiliates, providing commercial real estate loans.  Defendant Ready Capital Corp. is a Michigan corporation formed in 2015 and operated by its sole employee and president, Mark Backonen.  Both companies are part of the financial services industry and are involved in originating, structuring and marketing commercial loans.

A.  Plaintiffs

In addition to Ready Capital Corporation, the plaintiffs include its subsidiaries, ReadyCap Commercial, LLC, and ReadyCap Holdings, LLC.  Anuj Gupta has been President of Ready Capital Corp. since February 2014.  Together, the affiliated entities (referred to collectively by the plaintiffs as "Ready Capital") employ more than 400 people and have provided more than $3 billion in commercial capital lending to investors and small businesses in various states around the country.  Ready Capital Corp. has been listed on the New York Stock Exchange since November 2016.

Until at least February 2014, when Gupta took the helm, Ready Capital Corp. officially operated under its original corporate moniker, Sutherland Asset Management.  However, on February 6, 2013, the firm had issued a press release announcing the "nationwide debut" of its ReadyCap Commercial subsidiary, which prominently featured the name "ReadyCap

- 2 -

Commercial," with an associated logo.  The firm boasted that it would offer "bridge loans" and loans for rehabilitation of commercial properties, tailored to clients who could not meet the financial requirements to obtain conventional commercial loans from other lenders such as banks. On March 11, 2013, ReadyCap Commercial closed its first loan on a property in Dallas, Texas.

On July 17, 2014, the firm issued another press release announcing that it had qualified to begin issuing loans under the authority of the United States Small Business Administration's section 7(a) lending program.  The ReadyCap Lending subsidiary subsequently was assigned all lending authority and lien rights relating to the SBA loans that were issued by Ready Capital Corp. Through the end of 2014, ReadyCap Lending closed 150 SBA-backed loans totaling more than $426 million, which were issued to commercial clients in 20 states.  Gupta provided a summary of some of those loans, all but two of which were issued to clients in Illinois.  One loan was issued to an Indiana entity, and another, for $1.37 million, was issued to "Telegraph 9 Plaza, LLC," in Romulus, Michigan.

Gupta attested that, by the end of 2014, Sutherland Asset Management and its subsidiaries publicly were operating exclusively under the moniker "Ready Cap," which the firm regarded as a short form of "Ready Capital," similar to the colloquial connotation "Chevy" for "Chevrolet." However, the firm realized certain problems with that nickname, including when it discovered that a company that made camera lenses already had registered the internet domain name readycap.com, rendering it unavailable for the plaintiffs' use.  As a result, the firm decided in early 2015 to adopt the full form "Ready Capital" as its public brand to avoid customer confusion and brand conflict stemming from the abbreviated moniker.  The rebranding campaign, however, took more than three years fully to be realized.  Finally, on September 24, 2018, the firm issued a press

release announcing that Sutherland Asset Management officially had changed its name to Ready Capital Corporation.  The release included exemplars of the firm's new "Ready Capital" logo.

Gupta says, however, that long before the official announcement of the corporate renaming, the firm had adopted "Ready Capital" as the designated "house brand" for all of its subsidiaries, and it had begun using the name "Ready Capital" as a moniker for its loan securitization filings. In April and May 2015, the firm registered the assumed names "Ready Capital" and "Ready Capital Structured Finance" (the identifier for a new subsidiary formed in 2015) with secretaries of state in New York, California, and South Dakota.  Also, on April 6, 2015, the firm procured a trademark search from Corporation Service Company for the name "Ready Capital" as used in the context of "financial services, namely loan origination services."  That report, Gupta says, did not disclose any hint of the defendants' competing use of the brand.

In May 2015, the firm engaged an advertising consultant to create a logo and other materials for the "Ready Capital" brand, which were featured in a press release that was posted to a new website, rclending.com.  The press release was posted publicly on November 1, 2015, and Gupta attested that rclending.com then became the firm's "primary website."  The press release also included information about qualifications for issuance of new loans.  Materials featuring the logo and information for prospective borrowers were distributed by lending agents in various venues, by email, during client meetings, and at conferences.  On May 8, 2015, the initial press release announcing the "Ready Capital" brand was published via PRNewsWire, which featured it on more than 190 websites with a "potential audience" of more than 20 million viewers.  The press release also was picked up by various business publications.  By the end of 2015, Ready Capital Structured Finance had closed deals on 11 loans totaling more than $88 million, which were issued

to clients in California, New York, Ohio, Florida, and Texas.  The firm issued more press releases in November and December 2015 promoting its success at closing several of those lending deals.

In April 2015, the firm bid unsuccessfully on an auction for the existing internet domain name "readycapital.com," which was owned by a Canadian entity.  When it was unable to obtain that domain, it elected to centralize its entire internet presence and consolidate its email communications under the "rclending.com" domain.  The overhauled website, which was rolled out by November 21, 2015, featured promotional materials for ReadyCap Commercial, ReadyCap Lending, and Ready Capital Structured Finance, all of which were identified as "Ready Capital Lending Divisions."  Between May and July 2015, promotion of the new website through various means including "email blasts" to potential clients generated more than 7,100 page views by more than 5,700 unique visitors.  Between May and December 2015, the three lending divisions closed deals on 135 loans totaling more than $325 million, which "included 22 loan transactions totaling $48,736,000 in the states of Michigan, Ohio, Indiana, and Illinois."  All of these 2015 loans were made, and the deals were promoted, using the new "Ready Capital" brand.  The earliest transaction identified under the Ready Capital brand was a loan issued to a client in Jacksonville, Florida, on May 13, 2015.  Among the 22 loans issued in the Midwest was an October 9, 2015 loan of $2.29 million on the County Line Plaza property in Sterling Heights, Michigan.

In November 2015, the firm issued a mortgage backed security instrument that securitized many of its 2015 loan issuances as a retail investment vehicle, and that security was issued under the name "Ready Capital Mortgage Trust 2015-2."  The security was registered to a newly formed Delaware LLC, which acted as the "depositor" for the security and which was named "Ready Capital Mortgage Depositor."  The underlying mortgages were backed by collateral in the form of the commercial properties against which they were issued, including one property in Michigan.

The new investment vehicle was marketed to "investors across the country both in person and remotely beginning in early October" 2015, via the circulation of a preliminary offering memorandum.

Throughout 2016 through 2018, the firm closed 109 loans totaling more than $206 million that were issued to clients in Michigan, Ohio, Indiana, and Illinois. Those included 15 loans totaling more than $35 million that were issued against commercial properties in Michigan. However, in mid-September 2018, after the plaintiffs became aware of the defendants' Michigan operation and a dispute arose over the competing uses of the mark, they halted their lending and promotion activities using the Ready Capital brand in Michigan. Gupta attested that between late 2018 and early 2020, when the firm resumed its operations in Michigan, approximately $25 million to $50 million in lending business was foregone. After business was resumed, the plaintiffs closed three loans in Michigan in 2020, totaling more than $47 million.

On January 20, 2017, the plaintiffs filed their trademark application, number U.S. Serial Number 87/308,059, for the mark "READY CAPITAL" covering "Financial services, namely, loan origination services." Registration number 5,444,430 was issued for the mark on April 10, 2018. U.S. Reg. Cert. 5,444,430, ECF No. 57-25, PageID.4035.

B. Defendants

Mark Backonen testified that Ready Capital Corp. was formed in 2015 to operate as "the marketing arm" for several other Backonen family companies — Gateway, LLC, BBC Capital, Nations Home Loan, and MPD, LLC — which he had operated over many years, and which already were in the business of brokering various types of residential and commercial loans, mortgages, and property interests. Backonen testified that "Ready Capital is the brand [for] almost everything that I do," and "people see me as Ready Capital." Backonen attested that he started

Ready Capital Corp. in 2015, and when asked how he marketed his businesses before then, he said, "I didn't," explaining that he previously received business mostly through referrals.

Backonen attested that he began using the name "Ready Capital" to market his brokering services for more complex business financing arrangements starting in the spring of 2015, when he began to receive more inquiries from potential clients wanting to engage him to set up more difficult loan transactions. The defendants submitted various business records showing that, in preparation for the launch of the Ready Capital brand, they had: (1) on June 2, 2015, purchased the internet domain name readycapitalcorp.com, (2) in September 2015, filed articles of incorporation for Ready Capital Corp., opened a business checking account in the company's name, contracted for website design, email, and toll-free telephone service, and bought another domain name, readycapitalmi.com, and (3) in October 2015, bought "Ready Capital" business cards. Backonen then began marketing his loan brokering services to professionals in the lending business and other potential clients via email and LinkedIn.

Backonen testified that he personally attended various commercial and professional conferences and conventions in 2015 and in later years to promote Ready Capital. In October 22, 2015, the defendant conducted a "mass email marketing campaign" promoting "Ready Capital" as "Michigan's alternative lender for business," which included sending out "marketing materials for Ready Capital of Michigan." Similar marketing materials had been sent out previously, as early as September 10, 2015. Backonen further testified that "from the moment [he] got started [with Ready Capital]," he began "contact[ing] everybody [he] knew to let them know [] what [he was] doing." He attested that the bulk of his marketing campaign was carried out via thousands of direct phone calls that he placed to solicit leads from associates and potential clients he had previously done business with or thought he might be able to recruit as clients. Backonen also exchanged

business cards with potential clients, produced flyers, and promoted the business on social media and via his website.

Backonen explained that, for various reasons such as business licensing and insurance requirements, Ready Capital Corp. did not make loans in its own name.  Instead, Ready Capital was used to market his services.  When loan transactions were closed, his other entities made them.  The defendants assert that "the marketing efforts of Defendant RCMI resulted in Defendant [sic] MPD, LLC closing on (3) commercial Bridge Loans," that were identified as being issued against various properties in Michigan between September 2015 and February 2016.  At his deposition, Backonen was examined about the details of those early loans, and he provided information on the identity of the borrowers, the nature of the subject properties, the purposes of the loans, and how the leads on various deals were acquired by him.  Although not included in the record presented to the Court, Backonen apparently produced in discovery extensive business records from those transactions.  The defendants further assert that since 2015, MPD, LLC made 53 other loans, all but two of which involved properties in Michigan.  The defendants submitted an exhibit that appears to be a summary of data on loans made since 2015, stating the loan amounts, dates, and location of properties in Michigan against which the loans were issued.  The defendants attribute all of those deals to the success of Ready Capital's marketing efforts.

C.  Notice Evidence

The defendants submitted evidence of internal emails that were circulated between members of management in the plaintiffs' businesses showing that the plaintiffs first learned about the defendants' operation in Michigan and its use of the "Ready Capital" mark to market commercial loans when they discovered the defendants' readycapitalmi.com website in March 2016.  Other emails indicated that in September 2017, the plaintiffs had retained legal counsel and

an investigator to examine the use of the mark by the defendants.  One year later, in September 2018, an email was circulated by Carole Mortenson, the plaintiffs' Chief Operating Officer, directing that no loans "of any kind" were to be originated in Michigan by any of the plaintiffs' business units.  One of the plaintiffs' loan agents relocated to Michigan in the summer of 2018 — and, for unexplained reasons, procured office space in the same building as the defendants — but he swiftly was directed to stop using the office address on his correspondence and to find office space elsewhere.

On December 4, 2018, Mortenson contacted Backonen by email to start a discussion about a proposal by the plaintiffs to resolve the parties' competing uses of the Ready Capital mark.  The plaintiffs initially proposed buying the rights to the mark from the defendants if the defendants would agree to give up all use of the name.  The parties exchanged a series of emails between January and March 2019, which appeared to converge on terms where the plaintiffs offered to purchase all rights to the mark for around $115,000.  However, by May 2019 the deal had foundered, and no further progress was made in closing the negotiations.  The plaintiffs subsequently filed this lawsuit in November 2019.

The defendants point out that, notwithstanding that the plaintiffs knew about the defendants' use of the Ready Capital mark since at least March 2016, the plaintiffs' Chief Financial Officer, Rick Herbst, signed a declaration in support of the plaintiffs' January 20, 2017 trademark application which attested, in pertinent part, that the plaintiffs were unaware of any other entity having a right to use the mark in commerce.  The defendants also point out that the plaintiffs filed a "statement of use" for the mark in February 2018 which asserted a "first use" as of "11/00/2015."  The plaintiffs, however, counter that the obvious misstatement of the first use date later was

amended to May 13, 2015, which is the date when the first loan originated under the Ready Capital brand was issued against a property in Florida.

### D.  Proceedings

In an amended complaint, the plaintiffs pleaded statutory and common law claims for infringement of a registered trademark, 15 U.S.C. § 1114 (Count I, V), false designation of origin, 15 U.S.C. § 1125(a)(1)(A) (Count II), and false advertising, 15 U.S.C. § 1125(a)(1)(B) (Count III). The defendants responded with a counterclaim seeking a declaration that they have not infringed the plaintiffs' mark (Count I), cancellation of the plaintiffs' trademark registration based on allegedly false statements in the plaintiffs' application materials (Count II), false designation of origin (Count III), and common law infringement (Count V).

The amended complaint also pleads a claim of deceptive practices under the Michigan Consumer Protection Act (Count IV), but in its opposition to the defendants' motion the plaintiffs conceded that the defendants' activities do not fall within the consumer-focused regulatory ambit of the MCPA.  The defendants pleaded a congruent claim under the same statute in their counter-complaint.  However, it appears to be undisputed that neither party's activity as "commercial lenders" falls within the purview of the MCPA.  The Court will dismiss those respective counts.

As noted above, the parties timely filed their cross motions for summary judgment.

### II.

The fact that the parties have filed cross-motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute.  *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate.").  Instead, the Court must apply the well-recognized summary judgment standard when deciding such cross motions: the Court "must evaluate each motion on its own merits and

view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on

which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When challenged, the party who bears the burden of proof must present a jury question as to each element of its claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *PDV Midwest Ref., LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

The parties raised the same arguments both in support of their demands for affirmative relief and in their oppositions to their counterparties' summary judgment motions. They each seek affirmative judgment as a matter of law on their own slates of competing claims.

Although the plaintiffs' briefs cast some doubt on the precise mark at issue here, the pleadings plainly focus the dispute on the competing uses of the trade name "Ready Capital" by the parties in their commercial lending businesses. At oral argument, plaintiffs' counsel confirmed that to be true. A core element of common law and statutory claims for trademark infringement and false designation of origin is the likelihood of confusion. *See* 15 U.S.C. §§ 1114(a)(1), 1125(a)(1); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996); *Lorillard Tobacco Co. v. Van Dyke Liquor Market, Inc.*, 471 F. Supp. 2d 822, 827-28 (E.D. Mich. 2007); *Peninsular Stove Co. v. Augst*, 288 Mich. 465, 470, 285 N.W. 24, 26 (1939). However, as to the Ready Capital mark (to be distinguished from "ReadyCap" and other

permutations occasionally used by the parties), the plaintiffs concede that the use of that mark by both the plaintiffs and the defendants in the course of substantially similar commercial lending businesses creates a likelihood of confusion about the affiliation of the entities and origins of their lending services, and the defendants offer no contrary argument.

The main focus of the dispute is on which entity first used the mark in commerce.  The defendants argue that the evidence conclusively demonstrates that they are the senior user of the "Ready Capital" mark in Michigan, as shown by the use of the mark in closing three loan transactions on properties in Michigan in September and October 2015, whereas the plaintiffs' evidence shows that their first transaction of any business in Michigan using the mark "Ready Capital" occurred in 2017.  The defendants argue that there is no evidence that the plaintiffs used the "Ready Capital" mark in Michigan for any commercial purpose before their only subsidiary entity using that mark began operations here in 2017, and there is no evidence that any of the plaintiffs' "national advertising" before 2017, via a "press release" and on a website, was directed to or reached any potential customers in Michigan.  The defendants contend that the plaintiffs' claims are barred by laches.  They also believe they should receive affirmative judgment on their claim for cancellation of the plaintiffs' trademark registration, because the plaintiffs stated in their trademark application that they were unaware of any other entity using the Ready Capital mark in commerce, when in fact they knew about the plaintiffs' operations in Michigan under that mark since at least early 2016.

The plaintiffs assert that they first used the "Ready Capital" mark in commerce when they closed a loan (in Florida) in May 2015, and that they acquired a presumptive statutory right to exclusive nationwide use of the mark when they filed their trademark application in January 2017.  They contend that they also acquired a common law right to "nationwide" exclusive use of the

mark when in 2015 they began operating as a "national lender" under the "Ready Capital" brand and proceeded to close loans using that brand name in Florida, New York, California, and Ohio, in May through December 2015. They reject the defendants' contentions, arguing that there is "no evidence" supporting the defendants' claimed first use of the mark in September 2015, because there is "nothing in writing" supporting the defendants' claims that they marketed their services using the Ready Capital brand from that date, the loan documents for the transactions that were identified by the defendants all name other entities as the record lender or mortgagor, and the "only evidence" that the defendants put forth to substantiate any involvement of Ready Capital Corp. (Michigan) in those deals was the testimony of their principal, Mark Backonen. Finally, the plaintiffs contend that the defense of innocent prior use is unavailable to the defendants, because their alleged prior use is not geographically "limited in extent," where Backonen testified that Ready Capital (Michigan) had advertised to and closed deals with clients outside of Michigan, in other states and "nationally."

A. Defendants' Prior Use Allegations

The defendants raise two related claims that each depend on evidence of their prior use of the "Ready Capital" mark. They assert an "innocent prior use" affirmative defense, and they assert a counterclaim seeking a declaration of non-infringement based their first use of the mark in commerce.

It is well established that, "[a]t common law, ownership of trademark or service mark rights is obtained by actual use." *Allard Enterprises, Inc. v. Advanced Programming Res., Inc. (Allard II)*, 249 F.3d 564, 571-72 (6th Cir. 2001) (citing J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 16:1 (4th ed. 2000)). "The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the geographic area in which the mark is used." *Id.* at 572. "Ownership rights flow only from prior use — either

- 14 -

actual or constructive." *Ibid.* "Federal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce, but federal registration is *prima facie* evidence of the registrant's ownership and exclusive right to use the mark, 15 U.S.C. §§ 1057(b), 1115(a), and constitutes constructive use of the mark." *Ibid.*

The defendants have asserted an affirmative defense of innocent prior use against all of the statutory and common law infringement and false designation claims.  To establish that defense, the defendants must show "'(1) that [they] . . . adopted [their] mark before the [plaintiffs'] . . . registration under the Lanham Act, and without knowledge of the [plaintiffs'] prior use; (2) that the trade area in which the [defendants] used the mark prior to the [plaintiffs'] registration was limited in extent; and (3) that the [defendants have] continuously used the mark in the preregistration trade area.'"  *Allard Enterprises, Inc. v. Advanced Programming Res., Inc. (Allard I)*, 146 F.3d 350, 361 (6th Cir. 1998) (quoting *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1124 (6th Cir. 1996)).  The defendants have put forth ample and uncontested evidence to prove those elements in this case.

First, Mark Backonen testified that when he began using the "Ready Capital" mark in 2015 he was unaware of the plaintiffs' use of the same mark.  Backonen dep., ECF No. 58, PageID.4296 ("A. I haven't seen anything to make me think that anybody else was pursuing loans in Michigan under the name Ready Capital before I was. . . . And I was told the same by Ready Capital of New York. . . . A. Ready Capital of New York employees told me the same. Q. They told you what? A. That they didn't close loans in the name of Ready Capital in Michigan.").  Backonen attested that he first became aware of the plaintiffs in Fall 2018 when he met Andrew Simon, who presented as a sales representative for "Sutherland Asset Management" and who discussed renting office space and possibly working together in business.  Only later, after Simon took up residence in the office,

- 15 -

did he say that Sutherland was "changing its name and actually intending on operating under the name Ready Capital."  The plaintiffs have not put forth any evidence to rebut that testimony by Backonen.

The plaintiffs throughout their briefing attempt to criticize Backonen's testimony as "uncorroborated" or "self-serving," but they have not cited any authority that upsets the well settled principle that sworn testimony by a single witness with personal knowledge is first-class evidence, both for the purposes of trial and at the summary judgment phase.  It is widely held that such direct evidence is sufficient even to support a finding of guilt beyond a reasonable doubt in criminal proceedings.  *United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995) ("Circumstantial evidence and direct evidence are accorded the same weight and [even] the uncorroborated testimony of an accomplice may support a conviction under federal law.") (citing *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990); *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985)); *Brown v. Davis*, 752 F.2d 1142, 1144-45 (6th Cir. 1985) ("[T]he testimony of a single, uncorroborated prosecuting witness or other eyewitness is generally sufficient to support a conviction.") (citing *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979); *United States v. Smith*, 563 F.2d 1361, 1363 (9th Cir. 1977); *United States v. Terry*, 362 F.2d 914, 916 (6th Cir. 1966)).  It certainly is adequate to support a party's position in a civil proceeding, and when uncontested it can eliminate a material fact dispute.

In their briefs and at oral argument, the plaintiffs rely heavily on *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047 (6th Cir. 1999), for the idea that uncorroborated testimony by a party in a trademark infringement case is insufficient to establish first use.  That case does not stand for that proposition and it is procedurally and substantively distinguishable.  The owner of the defendant in that case testified about his advertising activity using the contested mark in the

designated geographic area before the plaintiff obtained its federal registration of it.  When ruling against the defendant, the trial judge rejected that testimony, and the court of appeals held that this factual finding was well supported by the evidence.  *Id.* at 1053 ("Given the fact that [the owner] had admitted that he fabricated the original copy of the alleged 1990 letter to Budget, [the trial judge] was certainly free to find that [the owner] was not a credible witness.").  True, the court pointed out that there was no documentary or audio-recorded evidence of the claimed radio advertising.  *Id.* at 1053-54.  But the trial judge also found that the witness had not been truthful in other actions and testimony.  The court of appeals did not hold that the witness's evidence would have been legally insufficient if believed.  The case was decided on the basis of the propriety of the trial judge's credibility determination.  *Id.* at 1054 ("Without any documentary foundation to their witnesses' testimony, the District Court could only look to the witnesses' credibility for assurances of sincerity.  Indeed, the District Court had a duty to appraise the testimony and demeanor of witnesses.") (quotation marks and citations omitted).

Here, the plaintiffs have provided no actual evidence tending to impeach Backonen's sworn statements, and they have put forth no contradictory proofs of their own.  Backonen's testimony remains uncontradicted in this record, and the plaintiffs have furnished no evidentiary basis to reject it.

Nevertheless, a trademark plaintiff may prevail against a prior use defense, even if the defendant subjectively was unaware of the plaintiff's use, if it can demonstrate by adequate proofs that the plaintiff's mark previously had achieved significant recognition among potential customers in a relevant territorial market.  As the *Champions* court explained:

> [I]t is clear that if the "senior user located in one part of the United States has achieved a nationwide recognition of its symbol, then the [prior innocent user] doctrine . . . is not available as a defense for a junior user anywhere in the nation.  This is because the respective uses of the contested mark are not 'remote.'  The . . .

defense applies only where the senior user's mark is not known to customers in a remote area at the critical date of the junior user's first good-faith adoption and use. The junior user of a nationally known mark may claim that he did not know of the senior user's mark.  But this is quite irrelevant if it is found that an appreciable number of customers in his area did know of the senior user's mark."

*Champions Golf Club, Inc.*, 78 F.3d at 1124 (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 26.06 (3d ed. 1995)).  The plaintiffs, however, have put forth no evidence to sustain the required showing.  They have not presented any evidence suggesting the extent of either relative or absolute awareness of the competing brands among potential customers either "nationally" or in Michigan before the defendants' first asserted use of its mark in September 2015.

The only evidence even tangentially suggestive on that point is the plaintiffs' assertion of their market presence based on the closing of loans by the plaintiffs' Ready Capital Structured Finance (RCSL) subsidiary, which was newly formed in 2015.  But the plaintiffs' proofs show that the first loan issued by that entity was on a property in Florida on May 13, 2015.  The plaintiffs have not put forth any evidence to suggest that such remote business had any effect on awareness of its brand among potential customers in Michigan.  The plaintiffs also assert that RCSL closed several more loans in 2015 in "the Midwest," including one on a property in Romulus, Michigan in October 2015.  But that transaction came after the defendants' first use of the mark, which occurred, according to the defendants' unrebutted evidence, when a loan was closed by Backonen's MPD, LLC entity in early September 2015.  Backonen attributed that loan to the successful marketing efforts carried out under his new "Ready Capital" brand.  Moreover, the mere occurrence of one isolated transaction in Michigan in October 2015 is insufficient as a matter of law to allow any factfinder reasonably to reach a sound conclusion about the extent of market awareness of the plaintiffs' brand in the state, particularly since no direct evidence of awareness among potential customers has been offered.  Further eroding the plaintiffs' position is their own

evidence that the isolated transaction of a loan of $2.29 million was a miniscule portion of the plaintiffs' claimed "nationwide" business volume of $325 million in 2015. The plaintiffs have not identified any evidence that suggests how much of the overall commercial lending market the parties respectively occupied.

The plaintiffs' assertions that they published ads and press releases via general circulation magazines and generally accessible internet websites also is insufficient as a matter of law to demonstrate awareness of their brand among potential customers in Michigan, absent some proof of how many Michigan clients, or potential clients, those publications actually reached. *See Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 293 F. Supp. 3d 1334, 1369-70 (M.D. Fla. 2017) ("Simply operating a website that is accessible to every person in the United States does not confer common law trademark rights on the owner for the entire United States."); *see also Dudley v. Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012) ("The internet is not . . . a geographic territory to be subdivided; instead, it is a global communication medium that is accessible from anywhere on the planet.").

The defendants, on the other hand, have presented unrebutted testimony supporting their assertion that Backonen's efforts to promote his company reached thousands of potential clients in the state and resulted in the generation of a continuous stream of business under the Ready Capital brand from September 2015 to the present day. Notably, the plaintiffs concede that the defendants actively have used the mark in commerce in Michigan since at least March 2017.

As to use before 2017, Backonen testified that he never had marketed the lending services of his loan-issuing companies before Ready Capital Corp. was created, and that after it was set up it became the "marketing arm" for all of his businesses. Backonen testified that between June and September 2015, he filed articles of incorporation, bought two internet domains, opened a business

checking account, and contracted for website design, email, and toll-free phone services for the new marketing entity.  He then engaged in vigorous efforts personally to market the new brand to established business associates and potential future clients, which included mass emails, social media postings, and thousands of direct phone calls seeking to obtain or develop leads.  Backonen also personally attended business conferences and conventions to promote his new business. Throughout those efforts, Backonen says that he promoted "Ready Capital" as "Michigan's alternative lender for business."  He attested that "from the moment we got started [with Ready Capital]," he began "contact[ing] everybody [he] knew to let them know [] what [he was] doing." He attested that the bulk of his marketing campaign was carried out via thousands of direct phone calls that he placed to solicit leads from associates and potential clients he had previously done business with or thought he might be able to recruit as clients.  Backonen also exchanged business cards with potential clients, produced flyers, and promoted the business on social media and via his website.

Those efforts, according to the undisputed evidence presented, were successful.  Backonen testified that the marketing efforts through Ready Capital of Michigan resulted in MPD, LLC closing three commercial Bridge Loans in Michigan between September 2015 and February 2016. The defendants further assert that, since 2015, MPD, LLC made 53 other loans, all but two of which were on properties in Michigan.  Again, the plaintiffs raise objections that this testimony is "self-serving" and "uncorroborated," but they have put forth no evidence tending to impeach Backonen's testimony about the extent and success of his efforts using the Ready Capital brand to promote his family lending operation.  The evidence in this record shows that the defendants "used the mark in commerce" at least from September 10, 2015, and that they did so within a "limited area" within the State of Michigan where all of the loans in 2015 and early 2016 were made, and

where all but two of the more than 50 subsequently issued loans were closed. All of the defendants' claimed usage predated both the plaintiffs' constructive use based on its trademark application January 2017, and their first claimed use of the mark in a single transaction in Michigan in October 2015 — which, at any rate, was an inconsequential portion of its "nationwide" business, and which has not been backed up by any evidence suggesting that the plaintiffs' brand otherwise enjoyed widespread reputation among potential customers in Michigan.

Moreover, the emails produced by the plaintiffs corroborate rather than contradict the defendants' position that the plaintiffs' brand was unknown to potential clients in Michigan before 2018, when it completed a three-year effort to rebrand all of its businesses under the "Ready Capital" moniker. The plaintiffs' departing Chief Operating Officer, Carole Mortenson, wrote the following in a May 2019 email that was circulated to other executives:

> As you may know, there is another company using the Ready Capital name in Michigan (*they were there before we did our name change*). We are going back and forth with them and tried, unsuccessfully, to buy their name for $115k. They refused without making a counter offer. I had hoped this issue would be resolved prior to my leaving, but I think that is becoming less likely. Kenny is fully up to speed on this issue, but one of you probably needs to be involved also. I picked this up after Carole left and I do think it is more of an ops issue than financial, though it may ultimately come down to a cost/benefit decision on how to proceed. I'll invite you to participate in any calls going forward. Also, will send some prior emails for your background info. Jen has been tangentially involved in this also.

Email dated May 1, 2019, ECF No. 56-18, PageID.1514 (emphasis added). That admission by the plaintiffs bolsters Backonen's testimony that, when he (and, so far as the evidence shows, anyone else in Michigan) first became aware of the plaintiffs' operations within the state, it was under the rubric of Sutherland Asset Management, not "Ready Capital." Any emergence of the plaintiffs' brand within the territory occurred much later than the defendants' first use.

Nevertheless, the plaintiffs argue that the defendants' claims about particular transactions being closed by Backonen's companies are "unsupported," except by a chart showing a summary

of details of the loan deals and "Backonen's own testimony." Again, the criticism of Backonen's testimony as "self-serving" does not disqualify it, and the absence of contrary evidence and evidence undermining his credibility defeats any claim of a material fact question on that point. The document delineating loan details properly may be presented as evidence, presuming that a foundation can be laid to show that it is a summary of information culled from voluminous records of the defendant's affiliated lending businesses. The admissibility of summaries of voluminous records expressly is recognized by Federal Rule of Evidence 1006. *See United States v. Bray*, 139 F.3d 1104, 1109-10 (6th Cir. 1998). The plaintiffs contend that "nothing else" has been presented by the defendants to substantiate the transactional summary. But the proponent need only "make the originals or duplicates available for examination or copying, or both," Fed. R. Evid. 1006, and there is no suggestion that the defendants have withheld any of that documentation.

Moreover, at his deposition, Backonen submitted to lengthy examination about the details of the early loans made by his companies, during which he attested to such details as the identity of the borrowers, the nature of the subject properties, the purposes of the loans, and how the leads on various deals were acquired by him. Although not included in the record presented to the Court, Backonen apparently produced in discovery extensive business records from those transactions. The defendants have submitted as an exhibit to its present briefing what appears to be a summary of data on loans issued since 2015, stating the loan amounts, dates, and location of properties in Michigan against which the loans were issued. They attribute all of those deals to the success of Ready Capital's marketing efforts. All of the requisites are met for the proper admission of that summary data both for the purposes of summary judgment and at trial. The evidence presented — which is unrebutted by any evidence produced by the plaintiffs — amply demonstrates the defendants' sustained "use of the mark in commerce" starting from September 10, 2015.

- 22 -

Finally, the plaintiffs contend that the prior use defense is foreclosed because the defendants' asserted territory is not "limited in extent." That is contrary to the defendants' position and the available evidence. The defendants assert priority within the State of Michigan. No evidence has been presented that they engaged in any substantial business aside from two loans out of more than 50 outside of their claimed prior use territory. It appears to be undisputed that, at least since 2018, the defendants have not engaged in any business at all outside the state — evidently in an attempt to comply with an informal agreement between the parties to restrict their respective operations to avoid treading on each other's' territorial claims. There is no evidence to sustain the plaintiffs' position that the defendants have carried on any substantial business other than in Michigan, or that they made any concerted effort to do so.

The defendants have satisfied all of the *prima facie* elements of their prior use defense, and the plaintiffs have not offered any contrary evidence tending to defeat the defense. They have not, and cannot, establish that they hold any higher priority in common law rights to the brand within the State of Michigan (for reasons discussed further below). The plaintiffs assert that there yet may be a dispute over the exact geographical extent of the defendants' rights, but it has been held that where a business (such as commercial lending) is peculiarly regulated by the states, then state borders are particularly appropriate references for the establishment of geographic trademark priority carveouts. *See Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 473 (3d Cir. 1990) ("Although state boundaries are not always appropriate delineators of markets, alcoholic beverages are distributed and regulated on a state-by-state basis, and state boundaries are uniquely proper for defining their markets.") (citation omitted).

At this stage of the case, though, the parties have not put forth a sufficient evidentiary basis or fully developed legal arguments to justify an attempt by the Court to fix, as a matter of law,

geographic bounds of the defendants' territory having any lesser extent than the entire State of Michigan.  Defining the geographic limits of the defendants' prior use territory must await full development of the record at trial.

The defendants conclusively have established their prior use defense, at least nominally within the State of Michigan, and the plaintiffs have not come forth with sufficient competent evidence to challenge that defense.  The Court, therefore, will dismiss the plaintiffs' infringement, false designation, and false advertising claims (Counts I, II, III, and V), and grant declaratory relief to the defendants of non-infringement on Count I of their counterclaim, insofar as they concern (1) any infringement within the State of Michigan after September 10, 2015, and (2) any infringement of the "Ready Capital" registered mark elsewhere than in Michigan before January 20, 2017.

### B.  Defendants' Laches Defense

The defendants' affirmative defense of laches must be rejected because the defendants have failed to identify any way in which they were prejudiced by the delay in filing suit, and the undisputed record plainly demonstrates a reasonable justification for the delay.

"[T]he Lanham Act does not contain a statute of limitations.  Rather, courts use the doctrine of laches to determine whether a suit should be barred."  *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006).  The Sixth Circuit has observed that "there is a 'presumption of laches' that holds that an action is barred if not brought within the period of the analogous state statute of limitations and is alive if brought within the period," which, as pertinent here, is three years for suits under Michigan law alleging injury to personal property.  *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003) (quotations omitted).  The plaintiffs argue that they were not "aware" of the defendants' "infringing use" more than three years before it filed suit, because in March 2016 their only "awareness" was of the mere existence of an internet domain name registered by the

defendants.  However, even if the Court assumes that the clock began to run in 2016, the defense still cannot be sustained.  As the Sixth Circuit has explained, even where the "presumption" of laches may apply, the party invoking the defense still must demonstrate "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Ibid.*

In this case, the defendants have not identified any prejudice that they suffered due to the delay.  At oral argument defense counsel made reference to the defendants' continued business operations to its (unidentified) detriment using "Ready Capital" in its advertising.  But it is apparent, by the defendants' own admission, that the plaintiffs' delay actually benefited the defendants by virtue of the parties' mutual agreement to allow the defendants' continued operation under the disputed brand exclusively within the State of Michigan, after the commencement of their negotiations in late 2018.  *See* Backonen dep., ECF No. 58, PageID.4285 ("Then I agreed, foolishly, apparently, to, you know, pull back from Ohio, Illinois, and Indiana in agreement for [the plaintiffs] not being in Michigan, just until we could figure out what was what.").

Moreover, there is uncontroverted evidence of a justifiable reason for a substantial portion of the period of delay, which was the pendency of the parties' negotiations over a possible — although ultimately unconsummated — deal for an exchange of rights in the mark.  It has been held that "business negotiations between the plaintiff and the alleged infringer can justify a delay" and defeat the assertion of laches, because a delay in filing suit may be found "reasonable when the length of delay corresponds to the negotiations between the parties to develop a business relationship and resolve their patent and licensing issues and the plaintiff files suit 'a short time' after negotiations end without a final agreement." *Medinol Ltd. v. Cordis Corp.*, 15 F. Supp. 3d 389, 405 (S.D.N.Y. 2014) (collecting cases).  This rule is particularly applicable where "the parties carried out negotiations over the [mark] at issue in the suit," which involved efforts to foreclose

prospective litigation and "create a business partnership" aimed at pacifying their competing uses through a licensing arrangement. *Ibid.* In this case, a substantial portion of the alleged delay, at least between December 2018 and May 2019, reasonably and indisputably may be attributed to the parties' efforts to reach a negotiated compromise that would have foreclosed this suit. There has been no evidence presented to suggest that those negotiations did not actually occur or were not a motivating factor in the plaintiffs' decision to delay filing suit.

The defendant cannot prevail on its laches defense as a matter of law in light of the undisputed record.

### C. Cancellation of Registration

The defendants also seek affirmative relief in the form of cancellation of the plaintiff's 2017 trademark registration for "Ready Capital" based on supposed "fraud" in the course of its application for the mark. "A petitioner may seek to cancel a registration of a mark if the registration 'was obtained fraudulently.'" *Galperti, Inc. v. Galperti SRL*, 791 F. App'x 905, 909 (Fed. Cir. 2019) (quoting 15 U.S.C. § 1064(3)). But "[a] party seeking cancellation due to fraud must prove its claim by clear and convincing evidence." *Progressive Emu Inc. v. Nutrition & Fitness, Inc.*, 655 F. App'x 785, 798 (11th Cir. 2016) (citing *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F.3d 1279, 1289 (11th Cir. 2012)). "'This is necessarily a heavy burden, and any doubt must be resolved against the charging party.'" *Ibid.*

"A trademark applicant commits fraud when it knowingly makes false, material representations of fact with an intent to deceive the Patent and Trademark Office" as part of its application for a registered mark. *Galperti, Inc.*, 791 F. App'x at 909 (citing *In re Bose Corp.*, 580

F.3d 1240, 1243 (Fed. Cir. 2009)).  Here, the defendants have not carried their heavy burden of establishing that the plaintiffs' statements in their application were knowingly false.  They have not produced any evidence to rebut the plaintiffs' assertion that, in January 2017, the plaintiffs entertained a reasonable, good faith belief that there was no active user of the mark with any higher priority to its use either in Michigan or elsewhere.

The only evidence that the defendants point to in support of their claim for cancelation is the plaintiffs' awareness of the defendants' registration of the "readycapitalmi.com" domain name in March 2016, when the plaintiffs were contemplating their official name change, contrasted with a sworn statement in the trademark application, filed on January 20, 2017, asserting that the plaintiffs were unaware of any other user of the mark in commerce.  But the defendants have not produced any evidence that the plaintiffs were aware of any of the circumstances that (now) establish the defendants' common law right of prior use of the mark in Michigan.  Mere awareness that the defendants had registered a single internet domain name with passing similarity to the mark does not amount to clear and convincing evidence that the plaintiffs knowingly represented falsely that they were unaware of any other user of the mark with a legally cognizable prior right.

Moreover, although the plaintiffs cannot (now) prevail on their claim of priority, at least within the State of Michigan, the unrebutted evidence of the plaintiffs' dealings in various states under the "Ready Capital" brand, commencing from May 2015, and their evidence that a trademark search in 2015 had failed to disclose any hint of the defendants' claim to the mark, establish the plaintiffs' rebuttal that they had at least a good faith belief that they had the superior right.  That evidence likewise is uncontested.  The plaintiffs' mere awareness of other players in the market whose branding could become problematic does not support a finding of knowing, deliberate deception by a trademark applicant in its assertion of an exclusive right to use the mark.  *Galperti,*

*Inc. v. Galperti SRL*, 791 F. App'x 905, 910 (Fed. Cir. 2019) ("[A]t least in some instances, a party can truthfully claim 'substantially exclusive' use even while having knowledge of another party's use of the mark," and the applicant's "knowledge of other players in the marketplace does not make [an] averment of 'substantially exclusive' use of [the mark] *per se* false."); *Progressive Emu Inc. v. Nutrition & Fitness, Inc.*, 655 F. App'x 785, 798 (11th Cir. 2016) ("To prevail on its fraud claim at trial, Plaintiff would need to establish by clear and convincing evidence that Guy *knew or believed that another organization had a right to use* the mark.") (citations omitted).  The defendants have not offered any evidence to undermine that conclusion or otherwise create a material fact question on the plaintiffs' knowledge or belief of a competing mark used in commerce when they filed their application.

The defendants also point to an apparent scrivener's error where the original trademark application stated a "first use" date of "11/00/15."  However, as the plaintiffs have explained, that date was amended by the plaintiffs to May 13, 2015, which they derive from the consummation of their first loan transaction in Florida.  The defendants have not put forth any evidence to suggest that the transaction did not actually occur on that date, or that it was not sincerely advanced by the plaintiffs as the date on which they first used the mark in commerce.

The defendants have not identified evidence in the record to create a material fact question on all the elements of their claim for trademark cancellation.  The plaintiffs are entitled to dismissal of that count of the counterclaim as a matter of law.

### D.   Plaintiffs' Claim of Nationwide Common Law Priority

The plaintiffs also have moved for judgment as a matter of law on their claim that they hold common law priority for "nationwide" use of the "Ready Capital" mark that predates their January 2017 trademark application.

When the party moving for summary judgment also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense").  The plaintiffs therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute.  Thus, [they] must satisfy both the initial burden of production on the summary judgment motion — by showing that no genuine dispute exists as to any material fact — and the ultimate burden of persuasion on the claim — by showing that it would be entitled to a directed verdict at trial."  William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

The plaintiffs cannot prevail on their affirmative claim at this stage of the case, mainly because they have not offered any evidence that could establish that they had achieved significant market awareness for their brand either nationally, regionally, or in any particular state, including the State of Michigan, before the filing of the trademark  registration application constructively established their nationwide right to use the mark in January 2017.

"[T]he Lanham Act offers protection against infringement of both registered and unregistered marks."  *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 509 (6th Cir. 2004).  "To determine whether an unregistered mark is entitled to protection under § 43(a), the courts look to the general principles qualifying a mark for registration under § 2 of the Lanham Act."  *Ibid.*  "[I]n the absence

of federal registration, prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction." *Allard Enterprises, Inc. v. Advanced Programming Res., Inc. (Allard I)*, 146 F.3d 350, 358 (6th Cir. 1998).

The plaintiffs need not prove that their first use was "extensive" or "result[ed] in deep market penetration or widespread recognition." *Ibid.* "[E]ven a single use in trade may sustain trademark rights if followed by continuous commercial utilization.'" *Ibid.* (quoting *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975)). However, the senior user of a trademark can only claim common law rights to the mark in the geographic area in which the mark is used." *Allard Enterprises, Inc. v. Advanced Programming Res., Inc. (Allard II)*, 249 F.3d 564, 572 (6th Cir. 2001).

In this case, the plaintiffs have put forth evidence that they engaged in transactions within various states that predated their 2017 trademark application, but their use of the mark in Michigan can best be described as "sporadic or minimal." "'Trademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade.'" *Allard I*, 146 F.3d at 359 (quoting *La Societe Anonyme des Parfums Le Galion v. Jean Patou*, Inc., 495 F.2d 1265, 1274 (2d Cir. 1974)). Moreover, "[t]he geographic extent of that superior right . . . . extend[s] only as far as the area where [the senior user's] continuous prior use of that mark preempted [the challenger's] constructive use of its mark." *Ibid.*

The plaintiffs contend, however, that even if they did not engage in significant business within the State of Michigan, they should be deemed to have achieved priority within the state because Michigan must be regarded as lying within their "natural zone of expansion." The zone of natural expansion doctrine is a judge-made rule. Characterized by courts as a "legal fiction," it

was "created to provide senior users with expansion areas." *Tally-Ho, Inc. v. Coast Cmty. Coll.*

*Dist.*, 889 F.2d 1018, 1028 (11th Cir. 1989).   Courts and commentators have identified several

criteria that are used to demark a "senior user's imaginary zone of natural expansion." *Ibid.*  They

include:

> (1) How great is the geographical distance from the senior user's actual location to
> a point on the perimeter of the zone of expansion? (2) What is the nature of the
> business? Does it already have a large or small zone of actual market penetration
> or reputation? (3) What is the history of the senior user's past expansion? Has it
> remained static for years, or has it continually expanded into new territories?
> Extrapolating prior expansion, how long would it take the senior user to reach the
> periphery of the expansion zone he claims? (4) Would it require an unusual "great
> leap forward" for the senior user to enter the zone, or is the zone so close to existing
> locations that expansion would be (or is) a logical, gradual, step of the same length
> as those previously made?

*Ibid.* (quoting J. McCarthy, Trademarks and Unfair Competition § 26:9, at 304-05 (2d Ed. 1984)).

The plaintiffs have not put forth more than token evidence to make a favorable showing on

any of those factors.  Most conspicuously, they have produced no evidence suggesting the extent

of the market penetration of their Ready Capital brand either "nationally," or in "the Midwest," or

in Michigan.  The failure to produce evidence to establish market penetration has been found fatal

to the sort of sweeping and unsubstantiated claims of "nationwide" priority that the plaintiffs have

asserted in this case.  *See Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 986 (C.D. Cal. 2002)

("Because Glow, Inc. has not adequately demonstrated the extent of its current market penetration,

a zone of expansion that encompasses the entire nation is about as large a 'leap' as it is possible to

imagine.  Considering both evidence of actual market penetration and possible areas of expansion,

therefore, the court concludes that Glow, Inc. has not demonstrated it is likely to prove national

rights to the Glow mark.").

As to the Michigan market in particular, the plaintiffs have presented evidence of only one

transaction in a remote territory (Florida) that pre-dated the defendant's first use of the mark in

Michigan.  And it has pointed to only one Michigan transaction under the disputed mark that post-dated the defendant's first use in 2015.  The modest value of that isolated transaction lends little persuasive weight to the plaintiffs' claim that they had any market presence — much less actual market penetration or reputation — in Michigan before September 2015.  "Courts have declined to find market penetration when a party cannot establish that it has engaged in more than *de minimis* activity within that market."  *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, No. 03-6070, 2004 WL 2967446, at *12 (N.D. Ill. Nov. 15, 2004) (citing *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1400 (3d Cir. 1985) ("When sales activity does not exceed even a minimum threshold level, a court may properly conclude that market penetration . . . has not been established")).

The plaintiffs have presented, at most, evidence of transactions scattered across various states, with no clearly defined pattern of geographic progress from any discernable point of origin migrating inexorably toward inevitable occupation of the defendants' home market.  Certainly now, after January 20, 2017, the plaintiffs have a constructively established nationwide priority for use of their registered mark in any state (except, for the reasons discussed above, subject to the geographic carveout of the defendants' prior use right in Michigan).  But the evidence otherwise presented does not comprise the sort of specific proof of market presence in any state — or in every state — that is required to sustain a claim of "nationwide priority" under common law predating the date of the trademark application.  *Glow Indus.*, 252 F. Supp. 2d at 984-85.

"Generally, 'in the absence of federal registration, both parties have the right to expand [their use of an unregistered mark] into unoccupied territory and establish exclusive rights by being first in that territory.  In effect, it is a race between the parties to establish customer recognition in unoccupied territory.'"  *Glow Indus.*, 252 F. Supp. 2d at 983 (quoting 4 J. Thomas McCarthy,

McCarthy on Trademarks and Unfair Competition, § 26:13 (4th ed. 2002)).  And "'under common law principles, the senior user of a mark cannot monopolize markets that neither his trade nor his reputation has reached.' This 'zone of natural expansion' doctrine [merely] provides the senior user with some limited 'breathing space' in which to expand beyond its current actual use." *Tally-Ho, Inc.*, 889 F.2d at 1027-28 (quoting J. McCarthy, § 26:1, at 284, § 26:8, at 302).  The plaintiffs have not put forth the evidence necessary to establish as a matter of law that their "reputation had reached" Michigan in any tangible way before January 2017, let alone the "entire nation" to which they now lay claim for their brand.  They are not entitled to summary judgment on that part of their claim.

III.

There are no material fact questions on the defendants' affirmative defense and request for declaratory relief based on prior use of the mark and they are entitled to judgment as a matter of law on those issues.  The record does not contain sufficient evidence to establish fact issues requiring trial on the defendants' laches affirmative defense or Count II of their counterclaim seeking cancellation of the plaintiffs' trademark registration based on fraud, and the plaintiffs are entitled to a judgment as a matter of law on those issues.  A trial is required to determine if the plaintiffs can prove common law priority for "nationwide" use of the "Ready Capital" mark that predates their January 2017 trademark application, and the establishment of precise boundaries of the defendants' prior use carve out, if it is proven to comprise less than the entire State of Michigan.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment (ECF No. 56) is **GRANTED IN PART AND DENIED IN PART**.  The plaintiffs' claims for trademark infringement, false designation of origin, and false advertising (Counts I, II, III, and V) are **DISMISSED WITH PREJUDICE** insofar as they concern (1) any infringement within the State

- 33 -

of Michigan after September 10, 2015, and (2) any infringement of the "Ready Capital" registered mark elsewhere than in Michigan before January 20, 2017.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the plaintiffs' motion for partial summary judgment (ECF No. 57) is **GRANTED IN PART AND DENIED IN PART**.  The defendants' affirmative defense of laches and Count II of their counter-complaint seeking cancellation of the plaintiffs' trademark registration are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   April 20, 2021